Filed 10/30/14  P. v. Alvarez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PETER SEPULVEDA ALVAREZ,<br><br>    Defendant and Appellant. | F066202<br><br>(Merced Super. Ct.<br>No. CRM022429)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Robert C. Nash and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Peter Sepulveda Alvarez was charged and convicted of four counts of committing lewd acts on children under the age of 14 years (Pen. Code, § 288,

subd. (a)). Three of the victims were defendant's nieces, and the fourth victim lived across the street from defendant. The four girls did not tell anyone that defendant sexually molested them when the incidents occurred, and waited between two and 10 years to tell their families. Defendant relied on an alibi defense for one charge, and raised the inference that the first girl who reported him (and her mother) influenced the other three girls to make false claims against him.

On appeal, defendant contends the court abused its discretion when it allowed the prosecution to introduce rebuttal witnesses who testified about the character of one of the victims, and denied his motion to call a surrebuttal witness as to his good character. Defendant also contends the court's protective order was legally unauthorized.

We will affirm defendant's convictions, and strike the protective order and remand the matter for further appropriate proceedings on that single issue.

## FACTS

Defendant was married to his wife, Kathy. He was charged with committing lewd acts on his three nieces: Clarissa (count I), Julia (count II), and Erica (count III). His nieces were the daughters of Kathy's sisters. They knew defendant and Kathy as their uncle and aunt.

Defendant had a granddaughter named Esmeralda. She was not alleged as a victim and testified defendant never touched her. However, Clarissa and Julia separately testified that Esmeralda was present when defendant molested them.

Defendant was charged in a fourth count with committing lewd acts on Bianca (count IV), a girl who lived across the street from defendant and his wife. Bianca knew Esmeralda and Clarissa, and testified that the granddaughter was present when defendant molested Bianca.

### Clarissa (Count I)

Clarissa was 12 years old and in the seventh grade at the time of defendant's 2012 trial. Clarissa testified she was never scared to go to his house.

2.

Clarissa testified about an incident that occurred at defendant's house when she was 10 years old, around the end of July 2010. She and her cousin, Esmeralda (defendant's granddaughter) spent the night at defendant's house. Clarissa remembered that evening because the girls were going to Santa Cruz the next day. She testified defendant and his wife were the only adults in the house and was sure no one else was at the house that night.

Clarissa testified she and Esmeralda were going to sleep on separate couches in the living room. Clarissa testified they watched television with defendant that night. Clarissa was lying down on one couch. Defendant sat at the end of the same couch, and Clarissa placed her feet on his lap. Esmeralda was lying down on the second couch. Clarissa testified someone turned off the lights, and Esmeralda fell asleep. Clarissa closed her eyes and tried to sleep. She testified defendant stayed on the couch, and her legs were still on his lap.

Clarissa testified she did not fall asleep. She felt defendant move her feet from his body to the couch. She also felt defendant stand up. Clarissa testified her eyes were still closed, but she heard defendant unzip his pants and heard the pants fall to the floor. She kept her eyes closed. Defendant sat down again on the couch and put her feet back on his lap.

Clarissa testified defendant began rubbing her feet and legs with his hand, and he moved his hand up her thigh. She testified she felt his penis between her feet. Clarissa testified she did not say anything and pretended to be asleep because she thought "if I would be quiet it would stop sooner." Defendant kept touching her, and she repeatedly pulled her legs up. Defendant brought her legs back down and continued to rub her legs.

Clarissa testified defendant got up from the couch, and she opened her eyes and pretended to wake up. She got off the couch and spent the rest of the night on the floor. Clarissa testified that Esmeralda was still sleeping on the second couch and never slept on

3.

the floor. Clarissa testified she slept on the floor for the rest of the night. When she woke up the next morning, defendant and his wife were in the kitchen.

Clarissa testified what defendant did felt wrong to her. This was the only time that she spent the night at defendant's house. She avoided staying there again because she did not feel comfortable, and "I didn't want it to happen again." She further testified she did not tell anyone about the incident when it happened and did not say anything about it for two years because she was scared and afraid no one would believe her since "[i]t was family." As we will explain below, Clarissa finally told her mother in 2012, and that disclosure led to the revelations from the other three victims.

### *Cross-examination*

On cross-examination, Clarissa testified that her eyes were closed when defendant touched her, and she heard but did not see him unzip and drop his pants. She conceded that she did not see defendant do anything to her, and she just felt it happen. Defense counsel asked her to specifically describe how she was lying on the couch before defendant touched her, and whether defendant touched her with both hands. Clarissa replied she could not remember things that well.

"Q.  … Isn't it possible that maybe that wasn't [defendant] at all?

"A.  Wait, what?

"Q.  Is it possible that it was somebody else that night?

"A.  No.

"Q.  Well, you said you don't remember that well?

"A.  Well, yes.

"Q.  Okay. You remember he was there?

4.

"A.    Yes."[1]

Defense counsel asked Clarissa if she and Esmeralda slept on the floor that night. Clarissa said they were on different couches. Counsel asked if Esmeralda was lying if she said Clarissa slept on the floor. Clarissa replied that she began the night on the couch, and then she moved to the floor after defendant touched her, but Esmeralda stayed on the other couch.

On redirect examination, Clarissa testified she did not forget the overall incident, but she had forgotten some of the smaller details of what happened that night. On recross-examination, defense counsel again asked Clarissa if she forgot "who may have done this to you?" Clarissa said no. Counsel asked her if she was "simply blaming" defendant for "something someone else did." She again said no and testified, "I knew it was him."

## Julia (Count II)

Julia was 16 years old at the time of defendant's trial in 2012. She had also known defendant for her entire life. She spent the night at his house several times. She described defendant as one of her favorite uncles. Julia testified about several incidents where defendant touched her.

### *The incident on the bed*

Julia testified that when she was about 10 years old, she and Esmeralda spent the night at defendant's house because they were there for a party. Defendant's wife was also at the house. Defendant, his wife, Esmeralda, and Julia slept together on the same bed. Julia was on one end of the bed, Esmeralda was next to her, defendant was next to Esmeralda, and his wife was on the other end of the bed.

---

[1] As we will discuss in issue I, *post*, defendant contends the court erroneously permitted the prosecution to call three rebuttal witnesses who testified to Clarissa's good character, and asserts the defense never challenged Clarissa's character for honesty or truthfulness.

Julia testified that Esmeralda and defendant's wife fell asleep. Julia was trying to sleep, but she couldn't fall asleep. Julia testified she felt defendant's hand rubbing her thigh. She was facing the wall, away from defendant, and she did not turn around or make eye contact with him. She tried to move his hand away from her body or scoot away from him, but defendant continued to touch her. It lasted for about 15 minutes.

Julia testified she knew what defendant did was wrong because the "family is not suppose to be like that with each other." However, she did not say anything to defendant when he touched her because she was scared and did not know what to do. Julia did not tell anyone about the incident when it happened because she was afraid no one would believe her.

### *The incident in defendant's car*

Julia testified about another incident which began at her house in Turlock, when she was 11 or 12 years old. Defendant arrived to pick oranges from their tree. Afterwards, defendant asked her if she wanted to go on a car ride with him. She said yes because she loved car rides. She got into defendant's car and sat in the front passenger seat. Defendant was driving, and no one else was in the car.

Julia testified defendant drove into the country and said he would teach her how to drive. However, defendant "forcibly grabbed" her hand and placed it on top of his pants. Julia thought defendant exposed his penis and placed her hand on it. She tried to pull her hand away but he kept a strong grip and forced her hand to remain on his penis. Defendant told her to "suck it," but she refused. She did not say anything to him because she did not know what to do.

Julia testified she did not tell her mother or anyone about this incident when it happened. She was worried there would be a big fight in the family and did not want to create problems.

### *The incident at the family party*

Julia testified she continued to see defendant after these molestation incidents. She described another incident which occurred when she was between the ages of 10 and 12 years old. She went to defendant's house for a family party, and she played in the yard with her cousins.

Julia testified she was in the garage when defendant called out to her. No one else was around. Defendant was sitting down and said he wanted to show her something. Julia testified defendant grabbed her leg and rubbed it up and down. He touched her chest, and he rubbed her body under her clothes. Defendant tried to touch her vagina. She did not say anything to him and tried to move. Julia testified defendant's grip became stronger, but she managed to get away from him. She did not tell anyone about this incident because she did not want to start a fight in the family.

### *The New Year's Eve incident*

Julia testified about a New Year's Eve party she attended at defendant's house, which occurred closer to the time of trial. She was 13 or 14 years old, and in the seventh or eighth grade. Julia and her mother (Kathy's sister) spent the night at defendant's house after the party. They slept on the living room floor with Esmeralda, defendant's granddaughter.

Julia testified defendant came into the living room during the night and stood above her head. She opened her eyes and saw defendant. Defendant took her hand and tried to rub it against his penis. She did not say anything because she thought defendant believed she was asleep. She was afraid what he might do if he knew she was awake. She was "really scared" after this incident but did not tell her mother.

## Erica (Count III)

Erica was 21 years old at the time of defendant's 2012 trial. She had known defendant for her entire life, and they had a good relationship.

7.

Erica testified about an incident that occurred 11 years before defendant's trial, when she was about 10 years old and in the fifth or sixth grade. She spent the night at defendant's house. Erica watched movies in the living room with defendant and his wife, Kathy. Defendant and Kathy sat together on one couch, and she was on the other couch. Kathy eventually went to bed. Defendant stayed on his couch, and Erica fell asleep on the other couch.

Erica testified she woke up and realized defendant was sitting next to her. He had placed her head on his lap. He put his hand on the back of her head and pushed her head down toward his penis. Defendant kept pushing her head down. The side of her face touched his body, and she could feel his penis under his clothes.

Erica testified she became frightened, jumped off the couch, and ran to the bathroom. She locked the bathroom door and cried. In the morning, she sat outside defendant's house and waited for her mother to pick her up. However, she did not tell anyone about the incident because she was afraid no one would believe her.

Erica testified she never told anyone because she "wanted it to go away," and she did not think defendant would do it to anyone else.

Erica admitted she had been caught stealing in 2006 when she was 15 years old. In 2008, she was 17 or 18 years old and got into trouble when she was in a car with shotguns that she believed were stolen.

## Bianca (Count IV)

Bianca was in the seventh grade and 12 years old at the time of the defendant's 2012 trial. Defendant was her neighbor. Bianca knew Esmeralda and Clarissa. Bianca spent the night at defendant's house two or three times with these two girls. Defendant was nice to her, and she trusted him.

At some point before September 2012, Bianca spent the night at defendant's house with Esmeralda and Clarissa. Defendant and Kathy were there. The three girls fell

asleep in front of the television. Bianca and Clarissa slept on the two different couches, and Esmeralda slept on the floor.

Bianca testified defendant woke them up and asked the girls if they wanted to go to church. Clarissa said no because she was really tired. Bianca opened her eyes, saw defendant talking to them, and went back to sleep. Bianca testified defendant sat next to her on the couch and touched her body and vagina over her clothes and the blanket. She was scared and did not know what to do. She pretended to be asleep and curled up so defendant could not touch her. Defendant kept rubbing her. Defendant eventually stopped and left for church.

Bianca testified she did not tell the other girls or her mother about the incident. She was scared, and she did not want to lose her friends or get anyone in trouble. After the incident, she continued to go over to defendant's house to play with the other two girls because she did not want anyone to think she was hiding something, but she never stayed overnight again.

## THE VICTIMS' DISCLOSURES

The four victims did not tell anyone about the molestations when the incidents occurred. In 2012, Clarissa finally told her mother, Linda, who was Kathy's sister and the aunt to Julia and Erica. Linda told various family members, and the other girls revealed they had also been molested. At trial, defense counsel extensively cross-examined the victims about their disclosures, and tried to show that Clarissa and her mother influenced the other girls to claim defendant molested them.

### Clarissa

Clarissa testified that at some point in 2012, she told a girlfriend that defendant touched her in 2010. It was the first time she had told anyone about the incident. It had been bothering her for two years, and she felt better after talking about it with her friend. Her friend told her to tell her parents.

9.

On February 14, 2012, a few days after talking with her girlfriend, Clarissa told her mother, Linda, that they needed to talk about something. She told her mother about the incident when defendant touched her on the couch, and that it occurred the night before they went to Santa Cruz. Linda tried to comfort Clarissa, and said they would go to the police about it.

Clarissa testified she only saw her older cousins, Julia and Erica, once or twice a year. They did not call or text each other. Clarissa met Bianca once when Esmeralda introduced them. Clarissa never told Julia, Erica, Bianca, or Esmeralda about what defendant had done to her, either before or after she revealed the molestation to her mother.

## Julia

After Clarissa told her mother, Linda, that defendant touched her, Linda called her niece, Julia. Linda told Julia about Clarissa's disclosure and asked if the same thing happened to her. Julia was quiet, then she started crying and said some things happened a couple of times, but she did not reveal the details to Linda. Linda told Julia to tell her mother. Linda told Julia she was "going to take it to court."

After talking with Linda, Julia told her mother (Kathy's other sister) about the incidents where defendant touched her. Julia testified she decided to tell her mother because she felt what happened to Clarissa was her "fault" since she did not tell anyone what defendant did when the incident occurred.

Julia testified she did not regularly hang out with Clarissa or Erica, and they did not talk about the details of what defendant did to them. Julia only talked to them about "the same basic thing, it happened to all of us and that we didn't know."

## Erica

Linda was also Erica's aunt. Linda called Erica's mother (sister of both Linda and Kathy) and told her that defendant had inappropriately touched Clarissa. Erica's mother told Erica what had happened to Clarissa. Erica testified she told her mother that she

believed Clarissa because "I knew he would have done something like that." Erica testified she finally told her mother what defendant did to her on the couch.

On cross-examination, defense counsel extensively questioned Erica about whether she was telling this story to help Clarissa. Erica testified she was telling the truth, and felt she should have "said something a long time ago and it wouldn't have happened" to Clarissa. Erica testified she never talked to Clarissa, Julia, or Bianca about what defendant did to her.

**Bianca**

Bianca and her mother lived across the street from defendant. Kathy, defendant's wife, told Bianca's mother that the other girls had accused defendant of sexually molesting them. Bianca's mother told Bianca about this conversation, and asked her whether anything like that happened to her. Bianca testified she told her mother about the incident on the couch. Her mother told her not to worry, and she would handle it. Bianca felt better after telling her mother, but she was still scared about what might happen.

**THE INVESTIGATION**

After Clarissa's disclosure, Linda apparently sent voice and text messages to defendant's wife and daughter about the accusations. On February 21, 2012, defendant and his wife went to the Livingston Police Department and spoke to Detective Patrick Radke. Defendant reported he had been receiving annoying and harassing telephone calls from family members who accused him of child molestation. They played the messages for Radke. Defendant asked Radke to speak with Linda and tell her to stop calling him.

Based on defendant's complaint, Detective Radke contacted Linda. Linda explained the reason why she left messages on Kathy's cell phone that "this wasn't going to stay like this because I was going to the cops." Radke told Linda to stop making the calls and began an investigation into Clarissa's allegations.

11.

Detective Radke interviewed Clarissa, who was scared and upset but reported defendant sexually molested her.[2] Radke separately interviewed Julia and Erica. The girls reported defendant sexually abused them, and they cried during their interviews.

Detective Radke subsequently interviewed defendant, and asked him about the incident described by Erica, when she ran into the bathroom and locked herself inside. Defendant said Erica had locked herself into the bathroom once, but he never touched her.

**Prosecution expert**

Dr. Anthony Urquiza, a licensed psychologist, was the director of the child abuse treatment program at the University of California Davis Medical Center. He had evaluated and treated children who had been physically or sexually abused. He was not familiar with the facts of the instant case. Instead, he testified generally about the child sexual abuse accommodation syndrome, and the elements which included secrecy, helplessness, entrapment and accommodation, disassociation, delayed or unconvincing disclosure, and retraction.

Dr. Urquiza was asked a series of hypothetical questions based on situations similar to the four victims in this case, particularly how they failed to disclose the molestations for several years until they learned about the allegations made by other girls. Dr. Urquiza testified their reactions were consistent with the child sexual abuse accommodation syndrome. He was familiar with multiple cases where a child disclosed that he or she had been sexually abused after learning the perpetrator had abused someone else.

---

[2] On cross-examination, defense counsel attempted to show that Clarissa accused defendant of sexually molesting her to protect Linda, based on Clarissa's fear that Linda was in trouble for leaving the messages on Kathy's cell phone. Clarissa repeatedly testified she did not tell Detective Radke that defendant molested her to protect her mother.

12.

## DEFENSE

Defendant presented several character and reputation witnesses, who sought to undermine Clarissa's credibility and her testimony about what happened when she spent the night at defendant's house before she went to Santa Cruz.

## Antero Valter Pinto

Antero Valter Pinto testified he had known defendant for over 30 years. Pinto testified defendant was very good with the children in his family, he never heard of defendant harming a child, and it would never cross his mind that defendant would do anything inappropriate with a child.

Pinto testified he frequently went fishing with defendant all night. On the evening of August 7, 2010, Pinto was at defendant's house for a barbeque. Pinto testified defendant's entire family was there, including his granddaughter and her young friends. Around 9:00 p.m., defendant and Pinto left the house. They drove to the Delta-Mendota Canal and fished all night. Pinto testified defendant kept looking at his watch when they were fishing, and said he needed to get home the next morning because his wife and granddaughter were going on a field trip to Santa Cruz.

Pinto testified they returned to defendant's house around 7:00 a.m. on August 8, 2010. Pinto went into the kitchen to clean the fish, and defendant took his wife and granddaughter to catch the bus for their trip.

## Lisa M.

Lisa M. was defendant's adult daughter and defendant's granddaughter's mother. Lisa testified defendant was very protective of his children and grandchildren; he never did anything inappropriate to her when she was a child; and she trusted him with her daughter.

Lisa testified she remembered the evening of August 7, 2010, because she was going on a field trip to Santa Cruz with the children the next day. Pinto had dinner with the family, and then he left with defendant. Lisa testified she stayed overnight, and

13.

everyone went to bed early so they could get up for the trip the next morning. Lisa testified that her aunt Linda later sent her a text message that was very hateful.

The prosecutor asked Lisa if her opinion about defendant would change if she knew Clarissa testified in detail that defendant inappropriately touched her. Lisa testified she did not believe Clarissa and the other girls because defendant never touched anyone inappropriately while they were growing up.

**Esmeralda**

Defendant's granddaughter, Esmeralda, was 11 years old. She testified that she frequently slept overnight at defendant's house with her cousins. Defendant was really good with children, and he never harmed her or her cousins.

The granddaughter testified she spent the night at defendant's house on August 7, 2010, because they were going to Santa Cruz the next morning. Clarissa was also there. Defendant cooked dinner, and then left with Pinto to go fishing. She testified her grandmother (defendant's wife Kathy) and aunt Christina stayed overnight. She and Clarissa slept next to each other on the living room floor. She testified they never slept on the couches. She did not see defendant again until the next morning. She and Clarissa went to Santa Cruz the next morning, and they had a good time.

**Jovita A. and Calysta C.**

Jovita A. is defendant's niece and Calysta C.'s mother. Jovita testified that she trusted defendant with her children, and he would never harm them. At the time of trial, Calysta was 10 years old and testified defendant always treated her very nicely and nothing bad happened.

Calysta testified Bianca was her friend. Bianca once told her and Esmeralda that Bianca was afraid of her own mother. On further questioning, Calysta testified Bianca made this statement after the three girls got in trouble for staying too late at defendant's house. Bianca was afraid her mother would find out, and she would get in trouble.

14.

**Christina A.**

Christina A., defendant's adult daughter, lived at defendant's house, and testified defendant was very loving toward the family and he would never harm a child. Christina testified her opinion would not change if she was told about the testimony of Clarissa and the other children, because she knew defendant's character and did not believe it happened.

Christina also testified about the evening before Clarissa and Esmeralda went on the Santa Cruz trip. Christina testified Pinto joined the family for the barbeque, and then defendant and Pinto left for the night. Esmeralda and Clarissa went to sleep on the living room floor after midnight. Christina testified nothing unusual happened that night. Defendant returned around 7:00 a.m. the next morning. Christina and the girls went to Santa Cruz, and Clarissa was happy and enjoyed herself.

**Defendant's wife**

Kathy, defendant's wife, testified defendant had never touched or abused her children, grandchildren, or anyone else. She would never tolerate such behavior. Defendant had a great relationship with his grandchildren, and they were a close family.

Kathy testified Clarissa and Esmeralda slept at their house the night before the Santa Cruz trip. Kathy's adult daughters, Lisa and Christina, were also at the house. Defendant and Pinto left around 9:00 p.m. to go fishing. The girls slept in the living room. Kathy testified defendant returned in the morning. Kathy, her daughters, and the two girls went to Santa Cruz. Clarissa was happy and nothing was wrong.

Kathy testified that she and defendant contacted the police on or about February 21, 2012, because Linda left her a threatening voice mail message stating that defendant better "watch his back at all times" and " 'whatever happens to you, you deserve it too.' "

## REBUTTAL

The prosecution called three rebuttal witnesses who testified about Clarissa. Fawn Oliver testified she had known Clarissa for eight years, as both her teacher and the

15.

principal at her elementary school. Oliver regularly had contact with Clarissa and testified Clarissa had always been very honest and never had any problems with the other students.

Patti Morrissey was Clarissa's teacher in fourth grade and had known her for eight years. She testified Clarissa was kind of quiet and she was not a complainer. Morrissey testified Clarissa was very responsible and trustworthy, an "all around good student," and "one of those students that you could always count on to do the right thing."

Dina Rodriguez was Clarissa's teacher for part of her fifth grade year. Rodriguez testified Clarissa was a great student, and very trustworthy, honest, responsible, and respectful.

The prosecution also called its investigator, Mark Goddard, who testified about his interview with Esmeralda in September 2012. Esmeralda told Goddard about the sleepover at defendant's house the night before they went to Santa Cruz. She said she slept on the floor in the living room. However, she never mentioned anything about a barbeque, defendant's fishing trip, or defendant leaving the entire night.

Goddard also testified about his pretrial interview with Christina, defendant's daughter. Christina said she did not know where Clarissa and Esmeralda slept in the house on the night before the Santa Cruz trip. Christina also said defendant left the house around 12:30 a.m.

**The charges and convictions**

Defendant was charged with four counts of violating Penal Code section 288, subdivision (a), committing lewd acts on children under the age of 14 years: count I, Clarissa, between June 1, 2008, and December 31, 2010; count II, Julia, between January 1, 2004, and December 31, 2008; count III, Erica, between January 1, 1999, and December 31, 2003; and count IV, Bianca, between January 1 and February 27, 2012.

Defendant was initially charged with the special allegations that he committed a specified sexual offense against more than one victim, which could have subjected him to

16.

multiple indeterminate terms if he was convicted (Pen. Code, § 667.61, subd. (b)(4)).  At the beginning of trial, however, the prosecutor moved to dismiss the special allegations and potential life enhancements in the interests of justice, and the court granted the motion.

Defendant was convicted of the four counts.  He was sentenced to an aggregate term of seven years, and the court imposed a protective order between defendant and the four victims.

## DISCUSSION

### I. Admission of rebuttal evidence about Clarissa

Defendant contends the court should have excluded the prosecution's three rebuttal witnesses about Clarissa's character and reputation.  Defendant contends such evidence was inadmissible unless the victim's character had been attacked and his alibi defense did not attack Clarissa's character.

It is well settled that the failure to raise an evidentiary objection forecloses appellate review.  (Evid.Code, § 353, subd. (a);[3] *People v. Thomas* (1992) 2 Cal.4th 489, 520.)  Defendant never objected to the prosecution's introduction of the rebuttal evidence of Clarissa's character and reputation, and the court did not have a sua sponte duty to exclude the evidence in the absence of an objection.  (See, e.g., *People v. Visciotti* (1992) 2 Cal.4th 1, 53, fn. 19.)

In the alternative, defendant contends defense counsel's failure to object to the rebuttal witnesses constitutes prejudicial ineffective assistance.  To prevail on an ineffective assistance claim, "defendant must first show that ' "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." ' [Citation.]  Second, defendant must show that the inadequacy was prejudicial,

---

[3] All further statutory citations are to the Evidence Code unless otherwise indicated.

that is, ' "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." '  [Citation.]"  (*People v. Diaz* (1992) 3 Cal.4th 495, 557–558.)

In general, rebuttal evidence " 'must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf.'  [Citation.]"  (*People v. Fierro* (1991) 1 Cal.4th 173, 237–238, reversed on other grounds in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 205–206.) " '[P]roper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.' Restrictions are imposed on rebuttal evidence (1) to ensure the presentation of evidence is orderly and avoids confusion of the jury; (2) to prevent the prosecution from unduly emphasizing the importance of certain evidence by introducing it at the end of the trial; and (3) to avoid 'unfair surprise' to the defendant from confrontation with crucial evidence late in the trial.  [Citations.]"  (*People v. Young* (2005) 34 Cal.4th 1149, 1199.)

The prosecution's rebuttal evidence in this case addressed the character of Clarissa, one of the charged victims.  The admission of this evidence was subject to section 1103, subdivision (a), which states:

> "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) *of the victim* of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is:  [¶]  (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character.  [¶]  (2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1)."  (§ 1103, subd. (a), italics added.)

18.

Section 1103 does not allow the prosecution to introduce evidence of the victim's good character without the issue having been raised by the defense. (*People v. Gurule* (2002) 28 Cal.4th 557, 623.) The admission of the victim's character evidence under section 1103 is still subject to the evidentiary rules of relevance and prejudice. (*People v. Stitely* (2005) 35 Cal.4th 514, 547–548, fn. 15.) The court's rulings on rebuttal and character evidence are reviewed for an abuse of discretion. (*People v. Hart* (1999) 20 Cal.4th 546, 653; *People v. Cox* (2003) 30 Cal.4th 916, 955.)

In this case, the defense case focused on undermining every aspect of Clarissa's testimony, and raised the implication that Clarissa and her mother influenced the other mothers and their daughters to claim that defendant engaged in similar conduct with them. Defense counsel extensively cross-examined Clarissa as to whether she opened her eyes and actually saw that defendant was the person who sexually molested her, and questioned whether someone else could have touched her. More importantly, nearly every defense witness sought to contradict Clarissa's description of the time and place where defendant molested her. Clarissa testified defendant touched her during a sleepover with Esmeralda, the girls slept on separate couches in the family room, defendant sat next to Clarissa on the same couch and touched her, and it happened on the night before the girls went to Santa Cruz. Clarissa testified defendant and his wife were the only adults in the house that evening, and she did not describe any family gathering or barbeque.

The defense witnesses testified to a different situation at defendant's house the night before the Santa Cruz trip – defendant's wife and two adult daughters were present; defendant and his wife held a barbeque for everyone; Pinto was there for dinner; defendant and Pinto left around 9:00 p.m. and went fishing all night; Esmeralda and Clarissa slept next to each other on the living room floor; and they never slept on the couches. The defense evidence was that defendant's wife and two adult daughters were

in the house overnight, and defendant did not return until 7:00 p.m., just in time to take everyone to the bus for the Santa Cruz trip.

Defendant relied on an alibi defense for Clarissa's accusations – he was fishing with Pinto all night, and he was never in the living room with Clarissa and Esmeralda. However, there was another theme to defendant's alibi defense: Clarissa knowingly lied about every aspect of her story – who was at the house that night, what was going on, whether defendant was present or left, and where the girls slept. In contrast, while defense counsel extensively cross-examined the other three victims about their stories, the defense did not call numerous witnesses to try and undermine their accounts as to when and where defendant sexually molested them. Clarissa's character and reputation had been placed at issue.

Under these circumstances, the prosecution properly called three witnesses to testify to Clarissa's reputation for honesty and veracity – Clarissa's principal and two teachers. The witnesses gave limited testimony about Clarissa's reputation. They did not testify about defendant's character, and they did not address the specific charges. Defense counsel's failure to object to these witnesses was not ineffective since the evidence was admissible and any objection would have been overruled. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 119 [failure to raise meritless objection not ineffective assistance].)

## II. <u>The court's exclusion of defendant's surrebuttal witness</u>

Defendant's next issue is based on the court's denial of his motion to call a surrebuttal witness. Defendant contends the court abused its discretion and violated his constitutional right to compulsory process because it relied on a discovery violation to exclude his surrebuttal witness. As we will explain, the record does not support defendant's assertions.

## A.  Background

After the prosecution's final rebuttal witness, the court excused the jury and stated that defense counsel had "requested to add another character witness that hadn't been disclosed" as a surrebuttal witness.  The court stated the prosecutor had objected "on late discovery and [section] 352 grounds so I sustained the objection for late discovery.  [The] People were not given an opportunity to investigate the witness for more information."  Defense counsel did not object, disagree, or otherwise comment on the court's ruling.

## B.  Analysis

Based on this brief exchange, defendant contends the court abused its discretion when it denied his motion to call the surrebuttal witness.  There are several problems with defendant's argument.   Defense counsel never placed on the record the name of the proposed surrebuttal witness or made an offer of proof as to that witness's proposed testimony.  In addition, defense counsel never explained the reason for the delayed discovery of this witness – for example, whether the witness was someone who was not located earlier, failed to respond to the defense investigation, or only became relevant in light of the prosecution's case-in-chief or the rebuttal evidence.  Even if we were assume the court erroneously excluded the witness because of the discovery violation, it is impossible to determine the impact, if any, of that decision.

The court stated the proposed witness was going to testify to defendant's character, and defense counsel did not disagree with the court's statement.  A trial judge may limit "the scope of surrebuttal evidence to prevent repetition of matter that should have been covered in the original case or to prevent unfairness to the other party. [Citation.]"  (*People v. Lamb* (2006) 136 Cal.App.4th 575, 582.)  Defendant had already introduced several witnesses who testified to his good character, that he would never inappropriately touch a child, and he had not touched his own children or grandchildren.  A surrebuttal witness who would have again testified to the same issues would have been repetitive and time-consuming, and subject to exclusion under section 352.  (See, e.g., *id*.

21.

at pp. 581–582.)  The court did not abuse its discretion when it denied defendant's motion.

### III.    The protective orders

At the sentencing hearing, the prosecutor asked the court to impose 10-year protective orders between defendant and the four victims.  The court agreed and stated that it was granting a protective order for "the ten-year period authorized under the Penal Code and that [defendant] have no contact and stay 100 yards away from each of the four victims."  The court asked the clerk to print out the appropriate form for its signature.

Both defendant and the People agree the court failed to state any statutory authority for the protective orders at the sentencing hearing and in the abstract of judgment.  In addition, the record does not contain the order which the court asked the clerk to prepare.

While defense counsel did not object, the court's failure to state the statutory basis for the order resulted in a legally unauthorized order.  (*People v. Scott* (1994) 9 Cal.4th 331, 354.)  Defendant contends the protective orders must be stricken because of the lack of statutory authority.  The People request remand of the matter for the court to clarify the statutory basis for the order.

We believe the matter should be remanded for the court to determine if there is a statutory basis to craft a legally appropriate protective order between defendant and the victims in this case.

### DISPOSITION

The protective orders are stricken.  The matter is remanded for the superior court to determine if protective orders may be legally imposed in this case and, if such orders are imposed, to state the statutory basis.  In all other respects, the judgment is affirmed.

22.

_____
Poochigian, Acting P.J.

WE CONCUR:


_____
Franson, J.


_____
Peña, J.